SUCCESSION

OF No. 7714.

ANTONIO CAROLLO

October 27th, 1919.

On Motion to Dismiss.

CHARLES F. CLAIBORNE, JUDGE.

A motion has been made in this Court to dismiss the appeal herein on the two following grounds:

1o That no surety has signed the appeal bond; and

2o That no citation of appeal was served until July 29th, although the appeal was granted on petition by order dated July 3d, and made returnable on July 28th.

The name of the surety is not mentioned in the body of the bond. The bond is signed by the appellant, the "Succession of Antonio Carollo by F. Manale, Administrator". "Signed, sealed, and delivered in the presence of (signature) Cassidy Barrett". No other signature appears on the face of the bond. Upon the back of the bond are the following printed words:

"Affidavit of Surety"

George Untereiner being duly sworn, says: That he is worth over and above all his debts and obligations Fifty Dollars in assets that can be subjected to levy under execution, and that he resides in the Parish of Orleans.

Sworn to and subscribed before me

this 3d day of July, 1919.

"Signed" Geo. J. Untereiner

Charles V. Macaluso,
Not. Pub.

"Affidavit of Principal"

Frank Manale, Administrator of Succession of A. Carollo, being duly sworn, says that he is informed and believes that George J. Untereiner the surety on this bond, is worth over and above his debts and obligations in assets that can be subjected to levy under

340.

execution, the amount for which he has bound himself
on this bond.

Sworn to and subscribed before me

this 3rd day of July, 1919.

"Signed" F. Manale

Charles V. Macaluso,
Not. Pub.

The George J. Untereiner and Charles V. Macaluso, mentioned above, are both attorneys at law representing the appellant herein.

Section 4 of Act 112 of 1916 provides:

"That no officer of any Court shall accept any bond, unless each surety thereon shall have made oath that he is worth, over and above all his debts and obligations, in assets that can be subjected to levy under execution the amount for which said surety has bound himself in said bond, and unless the party furnishing such bond shall have made oath that he is informed and believes that each surety on said bond is worth, over and above said surety's debts and obligations, in assets that can be subjected to levy under execution, the amount for which said surety has bound himself in said bond, provided that the provisions of this Section shall not apply to Surety Companies authorized under the laws of this State to do business in this State".

It is evident that the two affidavits above mentioned were made in accordance with the requirements of the above Act, one by the Surety and the other by the principal. What other purpose could George J. Untereiner have in affixing upon that portion of the bond reserved for the "Affidavit of Surety", and where Sureties sign, his affidavit that he was worth Fifty Dollars, the amount of the bond? In arguing against the motion to dismiss, George J. Untereiner at the bar of the Court solemnly asserts that he signed the bond as Surety. All that the law requires is the evidence that some one has signed the bond as a surety whom the appellee can hold on default of the appellant. We think it appears with sufficient certainty that Untereiner did so sign.

See also 40 A & Eng Enc Law 621- 5 Cyc 735- 3 C.J. 1168 & 1236- 8th Kansas 28-8 Abbot New Cases 243

In State ex rel. Babin, 13 Ct. App., 260, this Court held that although the party named as surety in the bond did not sign the bond, it would be good as a bond if signed by another party under the signature of the principal,

This ruling was made in accordance with decisions of the Supreme Court under similar state of facts in 6 A., 74; *115 La 643 —* 33 A., 1461; 34 A., 539; 35 A., 560 and other cases quoted in the Babin case. ✕ *Ct App 12 9714* —

In all those cases the bond was maintained upon the ground that it was patent that some one had signed the bond as surety and that no other conclusion could reasonably be reached.

II Appellant urges that the appellee cannot complain of the want of timely citation of appeal, because the appellee has come into Court to move to dismiss the appeal on a prior and different ground, thus waiving citation.

In State vs. Montegut, 7 M., 447, the attorney-general prayed the Court not to notice the appeal for two reasons:

1o That the State was not suable, and

2o That the citation of appeal had been served upon him, which was not legal.

The Court said:

> "The attorney-general x x x having been served with the citation of appeal, having attended in this Court and prayed a dismissal, without pleading what he now calls an illegal or insufficient service in abatement, this Court is bound to proceed to the examination of the case on its merits".

This opinion was followed in Vallee vs. Hunsberry, 108 La., 137 where the Court said:

> "the motion to dismiss sets forth several grounds, the last of which relates to the want of notice, and it has been held that this amounts to a waiver of such notice. State vs. Montegut, 7 M., 448". 21 A., 278; 26 A., 148; See also 9 M., 497; 11 M., 20; 4 N. S., 359; 5 La., 256; 10 R., 140; 20 A., 22; 28 A., 835; 35 A., 127 — *42 A. 716- 108 La 139* —

The same jurisprudence applies to original citations to bring a defendant into Court.

"Want of citation is waived by the defendant who appears for any other purpose than to plead the want thereof". 1 L. D. p 112, IV, § 1; 134 La., 290; 125 La., 222.

We, therefore, conclude that by making the motion *as the first ground* to dismiss the appeal for want of a surety on the bond, the appellee has waived his motion to dismiss for want of suffi- cient citation *as his second ground,* although both grounds for dismissal were in- cluded in one and the same motion.

Motion to dismiss the appeal denied.

October 23rd, 1919.

March 22nd, 1920.

CHARLES F. CLAIBORNE, JUDGE.

This is a proceeding by an expert to fix his fees.

Frank Manale was appointed Administrator of this Succession on November 29th, 1918. The inventory amounted to $8778.01 composed of

| | |
|---|---|
| Household effects and office furniture | 865.00 |
| Liberty Bonds | 1000.00 |
| Open Account $2079.19 | |
| Appraised at | 1000.00 |
| Cash in Bank | 1913.01 |
| Real Estate | 4000.00 |
| Total | $8778.01 |

On December 20th, 1918, the Administrator filed the following motion:

"On motion of Frank Manale, x x Administrator of this Succession, x x and on showing to the Court that Antonio Carollo, the decedent, was married twice, first to Margaret Manale more than 21 years ago x x and secondly to Rose Dejean on March 16th, 1918 x x and that Antonio Carollo died on October 22nd, 1918 x x'x that the earnings of the community are found in the books of the decedent x x x that it is necessary that an expert accountant be appointed to audit decedent's books and ascertain the earnings of Antonio Carollo between the date of March 16th, 1918 and October 22nd, 1918, reporting each half month's earning separate and apart from each other, It is ordered that George H. Penn, Certified Public Accountant be appointed to audit the books of the decedent and report the earnings or profits made by Antonio Carollo from March 16th, 1918 until October 22nd, 1918 reporting each half month's earnings or profits separately to ascertain the community rights between Antonio Carollo and Rose Dejean, his widow, and be fixed by this Court."

On January 23rd, 1919, the Administrator filed a provisional account; upon that account, among the list of liabilities figured the following item:

"Geo. H. Penn Auditing Books $75.00".

This account was homologated by judgment rendered February 7th, 1919.

On May 29th, 1919, Geo. H. Penn filed a motion in which he alleged that he had been appointed to audit the books of the deceased; that the books of the deceased had been placed in his hands on January 29th, 1919; that he had completed his report and had filed a copy of it in Court; that he had expended not less than 151 hours or 18 and 7-8th days upon the work, - and that a reasonable charge therefor per day is $15, making $283.12; that the account had been filed and homologated without his knowledge; and he prayed that the Administrator show cause why said report should not be homologated, and why he should not be paid $283.12 as a privilege creditor superior to all others.

The Administrator answered this rule by averring that Penn had been appointed expert "after having agreed and contracted with this defendant to audit the books of the decedent for the price and sum of $75;"that the "account was filed, approved, and homologated with the full knowledge of George H. Penn after having been advised of the amount for which he was placed thereon for services in auditing the books as agreed to by him and informed that he would be paid for his services as soon as his work was completed" that Penn has no right to ask the homologation of his report for several reasons; that he should not be paid more than the sum for which he contracted to audit the books; and that the charge of $283.12 is excessive, unreasonable, and out of all proportion to the work done.

The trial judge rendered judgment in favor of Penn for $283.12 for the following reasons:

"There was some conversation between the expert and the Attorney, in which no specific agreement was reached and the expert rendered valuable service, much larger than that contemplated in the conversation, and, in my opinion, is entitled to proper compensation".

The rule was made absolute and Penn had judgment commanding the Administrator to amend his provisional account and to plac Penn thereon as a privileged and prior creditor for $283.12, and homologating his report.

From this judgment the Administrator has appealed.

The testimony is very short. George J. Untereiner, attorney for the Successibn, testified:

"When this matter came up I was looking after the Succession of Carollo and I told Mr. Penn we would have a set of books that we would probably have to be audited, and I asked him what he would charge to do the work, and he said $75.00, and I said "All right, I will get an order of Court and get the books; and I got an order of Court and had him appointed as expert, and delivered the books to him. x x x I filed the account and told him the account was homologated. I told him of it and said to him, personally, in his office: Mr. Penn, when you are through with your work, your money is there. Now it was upon that price that he made to me that I had him appointed by this Court to audit the books and make a report".

George H. Penn testifies that he had absolutely no knowledge of the account filed or that he had been placed thereon for $75; he denied thathe had ever entered into an agreement with Mr. Untereiner to perform the work for any amount; he says he worked 150 hours or 18 and seven-eighths days of eight hours each, for which he charged $15 a day. His testimony on cross-examination is as follows:

By Mr. Untereiner:

Q. Mr. Penn, how did you come to be employed in this ease?

A. I met you on the corner of Comon and Carondelet Streets one day, and you asked me if I would audit a set of books for an estate, and I told you I would be very glad to have the work.

Q. Was anything said about the cost?

A. You asked me what it would cost, and I told you it was impossible to tell this without looking at the books. You then gave me the impression it was a very small job and would probably take several days, and I told you, then, in that case, I would charge, say $75, or basing my ideas on $25 a day, for three days, which is the usual charge for that class of work. But I told you,

of course, it would be necessary for me to see the job before making that price. You said, then, you would try to get me appointed as expert, and I thanked you.

Q. Then, you did say it would cost about $75?

A. Based on what you said, that it would take several days' time.

Q. Did I speak to you about any other set of books?

A. Why, no; I don't recall it.

Q. That was the only set of books I spoke to you about?

A. Yes, sir: you didn't mention any name, but that was the only time you spoke to me about auditing books.

Q. And you stated it would cost about $75 to audit these books?

A. Based upon your statement to me, it would take two or three days' time.

Q. Did I say anything to you about two or three days?

A. You gave me the impression it was a very small job, and that it would take two or three days.

Q. You got an impression that it would –

A. You described it, and I thought you said it would take two or three days.

Q. Did I say anything about two or three days?

A. That is the impression you gave all the way through.

Q. And you said it would be about $75?

A. Based on what you said, it would take two or three days.

Q. When you got the books, did you tell me at any time it would cost more than $75?

A. No, sir.

Q. Did you tell me at any time you couldn't audit those books for that price?

A. I did not.

Q. Did you at any time tell me that you would require extra compensation?

A. I did not, as no compensation was ever named. I never considered I had ever made any price to you.

Q. Did you at any time tell me the cost of auditing those books would be more than $75?

A. I thought you had sense enough and knew the value of work.

Q. Maybe you are right, I haven't got any sense?

A. You forced the answer, sir.

Q. I ask you again, did you ever tell me you would charge more than $75 for auditing those books?

A. I named you a quotation at $25 a day, which is the customary charge.

Q. Did you say $25 a day?

A. That is what I based my price on.

Q. Did you tell me it would cost $25 a day?

A. I told you, from what you said, that it was a small job, it would cost $75, and from that impression you gave me, I expected to get $25 a day.

On re-examination, he said:

Q. And you deny most positively you ever made a price with him?

A. Yes, sir.

Q. Is the price of $15 a day the usual and customary price for that class of work?

A. It is below the usual price. I have just finished one job of the same character of work, at $25 a day, for another estate.

Both witnesses agree that there was a conversation concerning the possible charge for auditing the books. The only disagreement between them was that Untereiner testified it was a flat price of $75, while Penn said it would be about $75. We are of opinion that if Penn had intended to charge $15 or $25 a day, he should have so informed Untereiner. His statement that it would cost about $75, was certainly not calculated to communicate that information. It meant that it would cost that much, more or less. But after the books were delivered to Penn, he was then in a position to ascertain whether the work would amount to more than $75; he should then have spoken, and should have informed Untereiner that the work would cost more, or would cost at the rate of $15 a day; his silence at that time was equivalent to a confirmation of the probable price he had made. He certainly had no contract with Untereiner for $15 a day; the best he

349

could claim would be the meaning of his own words, about $75.
But there is such a distance between $75 and the amount claimed
here, $283.12, that it cannot be presumed that Untereiner would
have originally consented to it. Penn's statement to Untereiner
misled him. To allow Penn's claim would be to put his employer
at his mercy. He could with as much force have claimed $25
a day for 50 days. There is no evidence that Untereiner was
aware of the customary charge made by members of the association
of Certified Public Accountants. We are therefore of opinion
that even if no contract for $75 is proven, Penn is estopped
from claiming a larger amount. ✗

That much of the judgment ordering the homologation
of the Auditor's report was also an error as the Auditor had
no interest in having it done.

It is therefore ordered that the judgment appealed
from be reversed and annulled at plaintiff's cost in both
courts, *and that plaintiff's claim be rejected restricting his demand to the amount of $75.00 allowed him by the account filed and promulgated —*

Judgment reversed.

March 22nd, 1920.

*✗ It is the jurisprudence of this State that when a creditor, once presents a bill for a certain sum he is not permitted to recover more — 3a 292 – 11a 683 – 14a 508 – 23a 75 – See also 1 Cy 371 — and accountants' charges vary in amount — 13 Ct. App. 23 —*